Nathaniel F. Walker *vs.* Benjamin Walker.

No. 34.—NATHANIEL F. WALKER plaintiff in error *vs.* BENJA-
MIN WALKER defendant.

[1.] The testimony of a deceased witness given in a former action between the same parties, may be proven by any one who heard it.

[2.] The rule allowing such testimony to be proven in this way is *permissive* only, and must yield to the paramount rule which requires the best evidence to be adduced which the nature of the case will admit of.

[3.] If the testimony of the deceased witness, given in a former action, has been reduced to writing and agreed upon as correct by the parties, and filed under the sanction and approval of the Court, it not only *may* be, but *must* be adduced.

[4.] Where cross-interrogatories are substantially answered, the depositions of the witness will not be excluded, because the answer to the cross-interrogatories was not more full; especially on a trial in the last resort; and when the interrogatories have been deposited for some time previously in the Clerk's office, and no objections filed thereto.

[5.] The rule of practice is, that the plaintiff shall in the opening, examine all his testimony which goes to establish his case; the defendant shall then introduce his testimony in support of his defence, and in rebuttal of the plaintiff's proof; and then the plaintiff may offer any proof which rebuts that of the defendant; but nothing further in chief, except by permission of the Court, which permission should be given, upon sufficient cause shown; the relaxing of the rule being a matter of discretion—its exercise should not be controlled except in a case so gross and palpable as not to admit of hesitation or doubt.

[6.] It should require a very strong case of threatened evil, to justify a Court in preventing a party from giving additional confirmatory, cumulative and corroborative evidence, either of facts previously proved, or which tends to strengthen, add force or probability to such evidence.

[7.] A witness, who, when testifying on the stand, misstates a fact through inadvertance or forgetfulness, should be allowed the privilege, at any stage of the trial, to correct the mistake.

[8.] Where the issue is *devisavit vel non*, the witnesses, whether attesting the will or not, may give their opinion as to the testamentary capacity of the deceased, provided it is accompanied with the facts as to the conduct, conversation, or condition of the deceased, upon which the opinion rests.

Caveat in Upson Superior Court.    Tried before Judge STARKE, May Term, 1853.

This was an issue of " *devisavit vel non*," made upon the will of Mrs. Charity Walker; propounded by Nathaniel Walker,

executor named therein, and to which a caveat was filed, by Benjamin Walker, on the ground of weakness and imbecility of mind in the testatrix, arising from age and infirmity; and of undue influence and artifice and deceit on the part of the propounder, in procuring said will to be made. Upon this issue, the cause was submitted to a jury, and a large amount of evidence on both sides introduced; so much of which as was objected to, is as follows:

The Court permitted the Caveator to read to the jury the evidence of Elijah Thompson, delivered on a former trial of this cause, and contained in a brief of the evidence then filed, on a motion for a new trial. The witness was admitted to be dead, and the brief to have been agreed on as his evidence on the former trial.

The Caveator objected to this ruling.

*Answers of John Brown.* The part of the Testimony in which witness states his opinion objected to and objection overruled. The part which states the previous declarations objected to and objection overruled. He stated that he knew Testatrix ever since 1843, and boarded with her most of the time until her death, and that he nursed and waited on her during her last illness: That when he first knew Testatrix her mind was tolerably good and she could recollect very well, but during the last two years of her life her mind and memory entirely failed: That he would pay his board money on one day and she would entirely forget it by the next: That her memory failed so completely that when he paid her for board he would always have some one present to witness it: That in the last nine or ten months of her life her mind was materially worn, especially in spells of sickness, and was much worse after the death of her son Allen.

Brown states that after the death of Allen Walker, Testatrix said to him that she did not want Susan, Nat's wife to have the wrappings of her finger, and that the will they had made for her was not such a one as testatrix wanted.

*Answer of Mrs. Cheny.* Objected to so far as she gives her

opinion—objection overruled.   Also objected to, because it has not answered last cross interrogatories—objection overruled, and these answers have been in the office 6 days and no objection has been made before trial.

She states that she knew the parties; was intimately acquainted with Charity Walker for the space of five years, and found that her mind was much impaired; she had lost almost entirely her memory.  She' had dealings with her frequently during the time—bought chickens, butter, eggs, &c., from her, and had to pay for the same things twice owing to a want of memory on her part:   That it was in Hootensville from the year 1843 to 49, that she had to pay twice:   That Testatrix would send for her, and then after she had been with her a short time, Testatrix would tell her she had better go home; and when she had returned home, would often send for her in fifteen minutes to come to see her: she knew nothing about the Will.

### CROSS EXAMINED.

She does not remember the particular days she conversed with Charity Walker, except as to the year, which was in 1849: she was in the habit of trading with her:   That she has no doubt but Nathaniel F . Walker was one of her favorites :

### THIRD CROSS INTERROGATORY.

*Did any one aid or assist her in making the contracts with her ?   Did she not, as long as you lived near her, manage entirely, her sales of butter and eggs ?*

*Answer to 3rd Cross Inter .   She did in part only.*

*Interrogatories of Elisha Perryman.*   Objected to so far as he gives his opinion—objection overruled.   He stated that he knew Testatrix, and that she did not have sufficient mind or volition to make a will:   That he had frequently gone to her house and she would not recognize him, and seemed to have

lost the power of recalling the memory of things unless aided therein.

*Mary Barron's Answers* objected to as to her opinion—objection overruled; and as to her talking foolish, objected to and objection overruled.

She states that she was intimately acquainted with Charity Walker three years previous to her death, and was often in her house and company : That often Charity Walker would send for her, and after she got to her house, Charity would not know her ; and that on one occasion Mrs. Grant told her who she was ; and that sometimes after being with her but a little while she would tell her it was time to go home, for it was most night, although it was hours before sundown. From these facts and others of a similar character she says that her mind was impaired and wandering, and that she talked as foolish as a child six years old. This was a few months before her death: That she does not believe she was capable of making her last will and testament: That these things took place at her house.

### CROSS INTERROGATORIES.

She answers she believed it would take a sound mind and memory to write a good and valid will.

### CAVEATORS IN REPLY, TO THE REBUTTING EVIDENCE OF PROPOUNDER.

*J. J. Grant—Sworn.* Testatrix was my grandmother. Sometime before her death I called to see her. When I went in I found her in a very disturbed condition of mind. She commenced a conversation with me by calling me as usual by name. John James I have made a will, but it is not my will—they made it. All these things she said before I interrupted her. I interrupted her as soon as I could. I said, grandmother don't be talking in that manner. She went on then in a hurried manner to speak disrespectfully of uncle Nat. She said he was a runabout. I tried to stop her, and she would not

Nathaniel F. Walker *vs.* Benjamin Walker.

stop, and I got up and left.    I think she was rather in a tearful mood.    So far as I ever heard her say, or saw of her, she was very kind to her children, to all of them.

This witness objected to because not in rebuttal; but the Court held that the part which shows her dissatisfaction with the will is proper reply to the evidence of Mrs. Anders, who states that the old lady told her she had made a will, and had left her property to Nat.    The other part of the evidence replies to one of the witnesses going to show that Nat was a favorite.    This evidence may show that he was not an exclusive favorite.

CROSS EXAMINED.

I testified before the Ordinary the same in substance I now have done, and did not testify before the Ordinary that she said it was not her will.    I testified that she said they made it, which in substance I think is the same I now tell.    I did not say before the Court of Ordinary that she said it was not her will.    I think I testified before the Court of Ordinary that she said it was not her will; they made it.    Judge Floyd was the examining counsel and was present.    It was when this case was before the Court of Ordinary for the purpose of proving the will. I then testified that she was very much disturbed.    When I think, she was abusing a yellow girl about going to the factory and staying too long.    It may have been that she had sent the girl to the factory with some butter and eggs, and had stayed too long.    I tried to quiet her all I could while I stayed, and on failing, I left.

I testified before the Court of Ordinary that no one could cheat her about butter and eggs.    She said Nat was a runabout; and this conversation was a month or more before her death.    Should think from the way she talked, her intellect was rather wandering and excited.    She may have from the excitement said more than she intended.    Should not suppose from my long acquaintance with her she was hardly capable of making a will, unless some one had wrote it for her.    Can hardly say she was capable of dividing off her property, or of making

Nathaniel F. Walker *vs.* Benjamin Walker.

a will. Her health had been very infirm, and her mind was weak, and she may have been capable of making some sort of a will before that time. My mother is living, and I am her only child, and my father is dead. The heirs at law of my grandfather were all engaged in trying to break his will. All the property I had come to me by grandfather's will. All the heirs, except Nat, had tried to break the will. From my general knowledge of the property owned by my grandfather, I should think if all had been set aside, she would have received as much as she did as a legatee. Should think her legacy under the will worth eight or ten thousand dollars; as an heir at law, think she would have received ten or twelve thousand dollars.

*Caveators closed.*

Before the commencement of the argument, Mr. J. J. Grant asked leave of the Court to correct his testimony, and on being permitted to do so, proceeded as follows :

On more mature reflection, I incline to the opinion that my grandmother said that I have got a will, but I did not make it —they made it. When I say I incline to the opinion, I mean to the best of my recollection. I am not certain, but I incline to the opinion that this was her remark. I thought it right to make this correction. It is made after more mature consideration and reflection.

Mr. Grant made this explanation, after the Caveators had closed with him the evening previous. To the admitting of the said evidence, counsel for propounder excepted, on the following grounds :

First, That the testimony of John Brown should have been rejected, he not being a subscribing witness, and no sufficient or any predicate laid for his opinion as to testamentary capacity when the will was executed.

And that the declaration of the testatrix, as to what kind of a will she wanted, there being no fraud or undue influence shown, was improperly admitted.

Secondly, That Mrs Cheney's testimony does not fix the time of her acquaintance with testatrix; and if at all, long before

the making of the will, and the testimony showing nothing-like insanity was improperly received. And the Court also erred, because said interrogatories were read, there being no full and satisfactory answers to the last cross interrogatory.

Thirdly. That Elisha Perryman does not fix the time of his acquaintance with Testatrix, and gives no sufficient and legal predicate for his opinion.

That the answers of Mary Barron, detailing the foolish conversations of Testatrix, does not state these conversations; and that in the opinion of witness, Testatrix's mind was impaired and wandering, and that she talked foolishly like a child six years old, are conversations referred to upon which her opinion is based sometime subsequent to the execution of the will; and that the Court erred in admitting them; that the Court erred in admitting and not ruling out the testimony of John J. Grant, a witness for the caveator, because he had testified in this case before the Ordinary when John J. Floyd, Esq., counsel in the cause now, was present then as counsel, and conducted the case for the caveator; that the evidence of the said John J. Grant, was properly in reply for caveators, and not in rebuttal; that the conversation was long subsequent to the execution of the will, and ought not to have been received.

And that the Court erred in allowing the said John J. Grant to come in and explain his testimony, when it was not in rebuttal, and when given again in the morning before argument had, was in substance what he had detailed before; and thus the jury who, though, nevertheless, good men and true, were permitted to be influenced by the introduction at the time, and the matter introduced; and which said evidence of the said John J. Grant the propounder says was improperly received as to its legality, and the time, and the second time of its reception.

And on these several grounds, the propounder excepts to the rulings and decisions of the Court, objected to, as above stated.

HALL & CAREY, POE, NISBET & POE, for plaintiff in error.

FLOYD & GOODE, for defendant.

Nathaniel F. Walker *vs.* Benjamin Walker.

*By the Court.*—LUMPKIN, J., delivering the opinion.

[1.] The first error assigned in this case is, in permitting the Caveators to prove what Elijah Thompson swore to, on the former trial of this cause, he being dead; by using his testimony as incorporated in the brief of evidence agreed upon, on the motion for a new trial in the same cause.

It is insisted that the rule of evidence requires that a witness should be produced who heard the deceased swear on the former trial; and that this is not only the best, but the only proof that the Court is authorized to receive.

[2.] This species of testimony constitutes an exception to the rule rejecting hearsay evidence; and is founded in the necessity of the case. Its allowance is permissive only: that is to say, the evidence need not be lost; but a person *may be* called to prove what the deceased witness testified to, on the former trial. But the practice is by no means so restrictive as is supposed. And it must yield of course to the paramount rule, which requires the best evidence to be adduced, which the nature of the case will admit of.

[3.] Can it be doubted that the proof taken down in writing and agreed on *as true,* under the eye and sanction of the Court, is better than the recollection of any body as to what the deceased witness did swear? So far from excluding this testimony, we should seriously doubt whether the Court would not have erred, had it admitted the other, which is inferior, while the higher proof was in existence, and in the power of the party to produce.

[4.] The next complaint is, in suffering the depositions of Mrs. Cherry to be read to the jury, when she had failed to answer fully the third cross interrogatory.

The contest in this case was as to the testamentary capacity of Mrs. Charity Walker. Mrs. Cheny was asked, "*Did any one aid or assist her in making contracts? And while you lived near her did she not manage entirely her sales of butter and eggs?*"

The answer was, "*She did in part only.*"

VOL. XIV. 32

The response is short, but it is expressive; and applies to both branches of the inquiry. It instructs the jury as to the matter about which they were desirous to be informed, namely: that the Testatrix attended only in part to making contracts and the management of her affairs; and in part was assisted by others. This is the sum and substance of the answer; and it is sufficient, we think, to prevent the testimony from being rejected on the trial in the last resort—especially as the interrogatories had been in office for a length of time and no objections had been filed to their return or execution.

[5.] The next objection is as to the admissibility of the testimony of John J. Grant. First, In allowing him to be offered in sur-rebuttal, when he should have been examined in reply. And Secondly, In suffering him to come in the next morning after the case had been closed the over-night, and explain his evidence as given in, the previous day.

The rule of practice in the introduction of testimony is, that the plaintiff shall first bring forward all the testimony that goes to establish his claim; the defendant shall then introduce his proof upon matters of defence, and his testimony, rebutting the proof, adduced by the plaintiff; then the plaintiff by his proof rebutting that of the defendant. And after the plaintiff has introduced his proof, establishing his case; and the testimony of the defendant has been heard, the plaintiff is not entitled, as a matter of right, to introduce additional proof in chief. The Court, however, has the discretionary power to relax the practice, where justice requires that it should be done: and the judgment of the Court will not be reversed for the relaxation of the rule, or refusal to relax it, unless the error be gross and palpable.

[6.] I am aware that to prevent delay or unnecessary waste of time, that rules of practice have to be adopted in all Courts of justice. And while they are not so binding as those establishing rights, they, nevertheless, should not be departed from for trivial causes. And among these rules is that which regulates the order of examining witnesses—one of great importance, and without which jury trials would be interminable and intol-

Nathaniel F. Walker *vs.* Benjamin Walker.

erable.    Still I must say, that so much averse am I to withhol-
ing testimony, that I can hardly conceive of a case so gross and
palpable that I should feel constrained to control the discretion
of the Circuit Judge, from receiving at *any time* additional
confirmatory, cumulative and corroborative evidence of facts
previously proved, or which tends to strengthen, add force or
probability to such evidence.

[7.] And as to the privilege of explanation which was affor-
ded the witness, the next morning, a doubt or hesitation to allow
this, would have deserved the rebuke of this and every other
tribunal.    A witness through forgetfulness, or inadvertence,
misstates a fact: upon reflection, he discovers the mistake, and
seeks to rectify it.    Would it not be monstrous to deny him
the privilege ?    Is it not due to him, apart from any other con-
sideration ?    Should he fail to make the application so soon as
he detects the error, he would be guilty, undoubtedly, of moral,
if not of legal perjury.    And for the Court to refuse him per-
mission to make the correction, would be to transfer the guilt
from his conscience to theirs.

[8.] The next class of errors may be considered together.—
It consists in allowing the testimony of John Brown, Mrs. Che-
ney, Elisha Perryman and Mary Barron.    And the main objec-
tion to these witnesses is, although minor matters are specified,
that they were suffered to give their opinion as to the sanity of
Mrs. Walker, without furnishing the facts upon which their re-
spective opinions were predicated.

It would be an unnecessary consumption of time to examine
separately the depositions of these several witnesses.    We have
done so carefully, and there is not one of them that does not
state some fact or circumstance relative to the conduct, conver-
sation or condition of the Testatrix, which would justify the
expression of their opinion, according to the rule prescribed by
this Court in the case of *Potts et al. vs. House, Ex'r.* (6 *Geo.*
*Rep.* 324.)    Our opinion, therefore, is, that this exception is
not well taken.

There have been two verdicts against this will.    We see no-
thing, either in the testimony or the various rulings of the

Court, which makes it a duty, on our part, to send this case back.

Judgment affirmed.